# EXHIBIT A

*Execution Copy*

## TEAM RUBICON
## MASTER TRADEMARK LICENSE AGREEMENT

THIS TEAM RUBICON MASTER TRADEMARK LICENSE AGREEMENT (this "Agreement"), dated __9__ October, 2015 (the "Effective Date"), is entered into between Team Rubicon, Inc. a Minnesota corporation ("Licensor"), and Team Rubicon Global, Ltd., a Delaware corporation ("Licensee") (collectively, the "Parties," or individually, a "Party").

WHEREAS, Licensor owns and has the right to license certain trademarks listed on Schedule A (collectively, the "Licensed Marks," as further defined below);

WHEREAS, Licensee desires an exclusive license to the Licensed Marks in the Territory for use in connection with Licensee's business and Licensor wishes to grant such a license to Licensee subject to the terms and conditions of this Agreement;

WHEREAS, Licensor desires to safeguard, promote and maintain the Licensed Marks and the goodwill and excellent reputation associated therewith; and

WHEREAS, both Parties intend to assume certain obligations with respect to the Licensed Marks;

NOW, THEREFORE, in consideration of the promises and mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1.      Definitions.**   Unless the context of a provision herein otherwise requires, words importing the singular shall include the plural and vice-versa. The words "include," "includes" or "including" shall mean include without limitation, includes without limitation or including without limitation. For the purposes of this Agreement, the following terms have the meanings ascribed to them as follows:

(a)       "*Authorized Products*" means products and materials bearing and/or distributed using the Licensed Marks to indicate membership in and/or affiliation with a TEAM RUBICON Brand Organization, and/or to advertise and promote such organization's services and/or mission, such products and materials including, but not limited to, certificates, pins, signs, T-shirts, stationary, business cards, posters, brochures and multimedia.

(b)       "*Brand Identity Guidelines*" means those certain guidelines established by Licensor, that specify brandmark, typography, graphic elements, color palette and other visual elements of the Licensed Marks, as well as instructions concerning visual communication, to ensure correct and consistent use of the Licensed Marks by the Licensee and all permitted sublicensees.

(c)       "*Confidential Information*" has the meaning specified in Section 16 below.

(d)       "*Licensed Marks*" means the trademarks, service marks, trade names, trade dress, logos, designs, slogans, names, symbols and other indicia of origin set forth on Schedule A

*Execution Copy*

hereto as may be updated by Licensor from time to time during the Term, including but not limited to the trademark applications and registrations therefor.

(e)     *"Permitted Purpose"* means for (i) charitable services for, and resource allocation to, organizations concerned with disaster relief, crisis response, emergency response, emergency rescue, and veteran support, and including related outreach, education, advocacy, consulting, and training; (ii) indicating membership in and/or affiliation with a TEAM RUBICON Brand Organization; (iii) advertising and/or promoting such organization's services and mission; and (iv) providing, manufacturing, promoting and distributing Authorized Products.

(f)     "*Person*" means any corporation, partnership, joint venture, company, limited liability company, organization, entity or natural person.

(g)     "TEAM RUBICON *Brand Organization*" means Licensor, Licensee or any TRCU or TRRU.

(h)     *"Team Rubicon Country Unit"* or *"TRCU"* means a Team Rubicon affiliated non-profit entity in one of the pre-determined TRCU target nations specified in Schedule C attached hereto (as may be amended from time-to-time by the mutual agreement of the parties) operating as a disaster response organization focused on engaging military veterans, as specified by Licensee and which meets the operational standards set forth by Team Rubicon Global's Country Council.

(i)     *"Team Rubicon Ready Unit"* or *"TRRU"* means a Team Rubicon affiliated, non-profit entity that is forward-deployed in one of the pre-determined TRRU target countries specified in Schedule D attached hereto (as may be amended from time-to-time by the mutual agreement of the parties), and that is pre-positioned, pre-configured, and pre-equipped for rapid activation as a local base and support facility for one or more TRCU's in response to a disaster occuring within the TRRU's jurisdiction.

(j)     "*Term*" has the meaning specified in Section 12 below.

(k)     "*Territory*" means any jurisdiction worldwide, other than the United States.

(l)     *"United States"* means the United States of America and its territories and possessions, including the District of Columbia and Puerto Rico.

## 2.     Ownership

(a)     Licensee acknowledges and agrees that (a) Licensor is the sole owner of the Licensed Marks, including any related registrations, applications for registration, and all associated goodwill; and (b) all right, title, and interest in, and to, the Licensed Marks are reserved to Licensor for its own use and benefit. Licensee further acknowledges and agrees that all use of the Licensed Marks by Licensee and any accrued goodwill shall inure solely to the benefit of Licensor. Licensee shall not acquire any rights of any nature in or to the Licensed Marks or the goodwill associated therewith as a result

2

of Licensee's use pursuant to the terms of this Agreement or otherwise. All rights not expressly granted to Licensee under this Agreement are reserved to Licensor.

(b)     Licensor shall be the sole and exclusive Party entitled to procure and/or register additional marks within the Territory relating to Team Rubicon and its mission, provided that any such additional marks shall automatically become part of the Licensed Marks and subject to the terms and conditions of this Agreement. Licensor shall use its commercially reasonable efforts to endeavor to obtain and, if the same is obtained, maintain during the Term, in its own name but at Licensee's sole cost and expense, appropriate trademark protection for such additional marks as are reasonably requested by Licensee and agreed to by Licensor. Licensor may decline to seek such trademark protection (or, at any point after commencing to seek such trademark protection, discontinue its efforts to seek such trademark protection) if, in its good faith professional judgment, seeking such protection, the granting thereof, or the use of such trademark would likely, in the reasonable opinion of Licensor, infringe upon the rights of any third party, weaken any then-existing Licensed Mark or other trademark owned by Licensor, or expose Licensor to an infringement claim by a third party. Notwithstanding the foregoing, Licensor shall have no obligation to conduct an inquiry into the potential existence of the conditions described in the preceding sentence, or any obligation to decline to seek such trademark protection, even if Licensor determines that any such conditions exists. No failure to conduct such an inquiry or to decline to seek such trademark protection shall limit any of the Licensee's obligations under Section 9.

3.    **Limited Use; No Adoption or Registration of Similar Marks**.   Licensee acknowledges and agrees that, unless expressly permitted under this Agreement, it is prohibited from using the Licensed Marks or any component or translation thereof, or any term confusingly similar to the Licensed Marks. Licensee agrees that it shall not, directly or indirectly, during the Term or thereafter, anywhere in the world: (a) attack the validity of the Licensed Marks or the Licensor's ownership thereof; (b) attack the validity of the licenses granted to Licensee in this Agreement for the use of the Licensed Marks; (c) adopt or use any of the Licensed Marks or any component or translation thereof, or any term or designation confusingly similar thereto as a trademark, service mark, trade dress, trade name, corporate name, logo, slogan symbol, or domain name of Licensee without Licensor's prior express approval; (d) make application to register any of the Licensed Marks or any component or translation thereof, or any term or designation confusingly similar thereto; (e) permit any action or omission in derogation of any of the rights of Licensor in or to the Licensed Marks; (f) use the Licensed Marks or any confusingly similar marks for other than the Permitted Purpose or in connection with goods other than the Authorized Products; (h) attempt to sublicense the Licensed Marks to any Person other than as expressly provided under this Agreement; (i) otherwise seek to claim or appropriate the Licensed Marks as its own property; (j) use the Licensed Marks or Licensor's name in any manner that might dilute the distinctiveness of such assets or otherwise disparage Licensor; or (k) use the Licensed Marks in any manner inconsistent with this Agreement.

4.    **License**.

(a)     Subject to the terms of this Agreement, Licensor hereby grants Licensee an exclusive (even as to Licensor), non-assignable, fully-paid up, royalty-free, license to use the

3

Licensed Marks in the Territory for the Term solely in connection with the Permitted Purpose and in conformance with the "6 Points" operational and other requirements set forth in <u>Schedule E</u>.

(b)    Subject to the terms of this Agreement, Licensee may grant sublicenses to (i) any qualified TRCU or TRRU, or (ii) any vendor that has been authorized by Licensee to manufacture, market, distribute and/or sell Authorized Products, in each case, solely in furtherance of the Permitted Purpose, provided that: (1) for each proposed sublicense, Licensee obtains the prior written consent of Licensor (which consent shall not be unreasonably withheld or delayed); (2) Licensee has conducted an assessment of each such sublicensee's ability to perform its obligations pursuant to this Agreement and, upon Licensor's reasonable request, provides Licensor with adequate assurance therefor; and (3) each such sublicense shall be made subject to the terms, conditions and limitations of this Agreement. Licensee shall enter into a written sublicense agreement with each permitted sublicensee, which sublicense agreement shall be substantially in the form attached hereto as <u>Schedule B</u>, provided that the scope of rights and the obligations of each sublicensee set forth in each sublicense agreement shall be no less restrictive than such scope of rights and obligations set forth in this Agreement, particularly with respect to brand identity and quality control, and Licensor shall be an express third party beneficiary with respect to brand identity and quality control and the right to terminate such sublicense agreement for sublicensee breach. Each such sublicense agreement shall automatically expire or terminate upon expiration or termination of this Agreement.

(c)    Licensee or any TRCU, at their sole cost and expense, may only register Internet domain names that use Licensed Marks consisting of a Licensed Mark in combination with the applicable geographic region identifier (excluding the United States) and a top level domain (e.g., "TeamRubiconUnitedKingdom.com") without obtaining Licensor prior approval; provided that such Internet domain name shall be registered in the name of, on behalf of, and for Licensor. Licensee shall provide written notice to Licensor on a quarterly basis with a list of all Internet domain names it, or its permitted sublicensee's, has registered since its last such report, including the date of registration and the registrar.

(d)    Licensee and any TRCU, may use any Internet domain names registered in accordance with 4(c) above in connection with operating and maintaining any Internet websites offering and promoting Team Rubicon and Authorized Products; provided, that (1) such Internet websites and the goods and services offered using the Licensed Marks are solely for the Permitted Purpose and otherwise comply with this Agreement; (2) the content and look and feel of such Internet websites shall comply with the Brand Identity Guidelines, and (3) such Internet websites do not sell or functionally permit the sale of goods or services that are not for, are not consistent with, or otherwise reflect poorly on Team Rubicon, its mission, or the Permitted Purpose.

(e)    Absent Licensor's prior written consent, which may be withheld in Licensor's sole discretion, Licensee shall not under any circumstances use or authorize the use of, register, or create, any combined or composite mark or Internet domain name that

4

*Execution Copy*

includes any of the Licensed Marks in combination with the trademarks (or service marks) of another Person.

(f)    All uses of the Licensed Marks by Licensee shall be in accordance with the terms of this Agreement and the Brand Identity Guidelines.

(g)    Licensee shall display the Licensed Marks on all packaging for the Authorized Products and Services and on all other materials on which the Licensed Marks are used in such format as specified in the Brand Identity Guidelines, and shall use the symbols, "M.R.", ® or ™, as appropriate, immediately following the Licensed Marks to provide notice of Licensor's trademark rights.

(h)    Licensee shall not use the Licensed Marks in any way that would reasonably be expected to injure the value of the Licensed Marks or the goodwill associated therewith or with Licensor. Licensee hereby warrants that it shall not use the Licensed Marks in any manner that may, in Licensor's reasonable judgment, be inconsistent with Licensor's public image or that may in any way disparage or adversely affect Licensor or its reputation, nor shall Licensee, or any of its agents or employees, take any actions or conduct the operation of Licensee's business as it relates to the Licensed Marks in any manner which is illegal or may, in Licensor's reasonable judgment, be inconsistent with Licensor's public image or which may disparage Licensor or its reputation. For the avoidance of doubt, Licensee shall not use or allow any TRCU or TRRU to use the Licensed Marks in any manner which reflects poorly on Team Rubicon, its mission or the Permitted Purpose, including but not limited to in connection with: (1) the production or distribution of adult entertainment; (2) gaming or gambling activities; (3) the production of alcohol or illegal narcotic substances; (4) the production of tobacco or cannabis products; provided, however, that the foregoing restrictions with respect to the production of alcohol and tobacco shall not apply with respect to sponsors who are supporters of Team Rubicon and its mission.

(i)    In the event any of the Licensed Marks fail to reach registration, Licensee shall immediately abide by all and any instructions or directives provided by Licensor with respect to measures that may become necessary as a consequence of the grounds of the rejection. Nevertheless and for the avoidance of doubt, in the event that the Licensed Marks become rejected, this Agreement shall remain in full effect with respect to all and any surviving rights and shall be valid and enforced to the fullest extent provided by law.

(j)    The Licensee shall promptly stop using, or as Licensor may direct, modify the use of, any Licensed Marks in relation to any part or parts of the Permitted Purpose on receipt of written notice from Licensor that such use infringes or is reasonably likely to infringe the intellectual property rights of a third party or another licensee of Licensor or impede or impair any pending or planned registration provided that (i) Licensor shall give Licensee full details of the alleged infringement or impairment, together with such information and other materials forming the basis of Licensor's good faith reasonable judgment that such use constitutes, or is reasonably likely to constitute, an infringement of the intellectual property rights of a third party or may impede or impair a pending or planned registration; and (ii) Licensor shall permit the Licensee to

5

*Execution Copy*

recommence use of the Licensed Marks if, and as soon as reasonably practicable after, Licensor settles or otherwise resolves the matter with the third party with the effect that use by Licensee is permitted or would no longer amount to an infringement of such third party's rights or the impairment or impediment is no longer a concern.

5.    **Quality Control.**

(a)    Licensee acknowledges that the Licensed Marks are very valuable and must continue to be associated only with high quality goods and services in order to maintain their value. Licensee agrees that its use of the Licensed Marks is subject to the terms and requirements of this Section 5 regarding quality and mark usage, and subject to the Brand Identity Guidelines. Licensee further agrees to cooperate and comply with all quality control measures undertaken by or at the request of Licensor in order to preserve and protect the integrity of the Licensed Marks and shall not produce poor quality product or services.

(b)    Licensee shall maintain quality standards for all of the goods and services offered by it in connection with the Licensed Marks that are substantially equivalent to or stricter than the standard required for such goods and services by Licensor. Licensor shall have the right, at any time, to modify or supplement the quality standards to be maintained by Licensee by providing written notice thereof to Licensee. Licensor shall have the right, not more than once per year, to request and receive from Licensee, at Licensee's expense, a reasonable number of product samples, packaging, advertising and related marketing materials embodying the Licensed Marks.

(c)    If Licensor determines that Licensee, or any sublicensee, is materially not in compliance with this Section 5, then Licensor may notify Licensee in writing of such non-compliance. The notice of non-compliance shall set forth in reasonable detail a description of the nature of the non-compliance and any requested action for curing the non-compliance. Upon receipt of the notice of non-compliance, Licensee shall act promptly to correct the issues identified therein. If the non-compliance is not cured to the reasonable satisfaction of Licensor within sixty (60) days of the notice of non-compliance, without limiting Licensor's rights under Section 13(a) and Section 13(b), Licensee shall cease all sales or distribution of the goods and services at issue and cease offering such goods and services immediately. Licensee hereby acknowledges that damages at law would be inadequate relief in the event of any failure by Licensee or its sublicensees to comply in accordance with this Section 5 and such rights may be enforced in accordance with Section 16 below.

(d)    At the reasonable request of Licensor and at the expense of Licensee, Licensee shall permit representatives of Licensor or representatives appointed by Licensor to inspect Licensee's facilities and provision of services upon reasonable notice and during normal business hours to determine whether Licensee is maintaining the quality standards and is complying with the terms and conditions of this Agreement.

(e)    Licensee shall comply with all applicable laws and regulations and obtain all governmental approvals pertaining to (1) the sale, distribution, provision, and advertising of goods and services in association with the Licensed Marks, including the

6

*Execution Copy*

Authorized Products, (2) the use of the Licensed Marks, and (3) the conduct of Licensee's business in connection with the Licensed Marks. All such requirements shall be treated as quality standards enforced in accordance with this Section 5.

**6.**    **Royalty Free.**  This License shall be provided to the Licensee on a royalty-free basis.

**7.**    **Records; Audit Rights.**

(a)    Licensee shall keep its books of account and business records in a manner sufficient to establish the uses of the Licensed Trademarks.

(b)    Licensee's books of account and business records relating to the verification of the transactions covered by this Agreement shall be open for audit or inspection by Licensor and its authorized representatives during Licensee's regular business hours upon three (3) days' notice and shall remain available for a period of three (3) years after delivery of the last payment due hereunder.

**8.**    **Notification of Infringements.**

(a)    Licensee shall notify Licensor in writing of any actual, suspected or threatened infringement of the Licensed Marks of which it becomes aware during the Term. Such notice shall include sufficient detail to enable Licensor to pursue the alleged infringement.

(b)    Upon learning of any such potential infringement, Licensor may, but is not obligated to, take whatever action it deems necessary or desirable to protect or enforce its and Licensee's rights to the Licensed Marks, including the filing and prosecution of litigation, opposition or cancellation proceedings, the institution of federal or state proceedings and the right to settle, subject to Licensee's approval, which shall not be unreasonably withheld. In the event that Licensor takes such action Licensee shall provide, at Licensee's expense, reasonable cooperation to Licensor in the execution of any documents or other similar assistance required for Licensor to take such steps, including joining Licensor as a party in any litigation where reasonably necessary for the conduct thereof. Licensor agrees to notify Licensee in writing of Licensor's decision and course of action as soon as reasonably practicable following receipt of any notice from Licensee under 8(a).

(c)    In the event that Licensor elects not to exercise its rights under 8(b) or fails to take action under 8(b) within thirty (30) days of receiving notice of any actual, suspected or threatened infringement, Licensee shall have the right (subject to Licensor's prior written consent, which consent shall not be unreasonably withheld or delayed), but not the obligation, at its sole expense and upon prior written notice to Licensor, to take such action it deems necessary or desirable to protect or enforce its and Licensor's rights to the Licensed Marks, including the filing and prosecution of litigation, opposition or cancellation proceedings, the institution of federal or state proceedings, and the right to settle, subject to Licensor's approval, which approval shall not be unreasonably withheld or delayed. In the event that Licensee takes such action, Licensor shall provide, at Licensee's expense, reasonable cooperation to Licensee in

CPAM: 7045033.9

the execution of any documents or other similar assistance required for Licensee to take such steps, including joining Licensee as a party in any litigation where reasonably necessary for the conduct thereof. If Licensee decides not to take any action with respect to such potential infringement to enforce its rights pursuant to this Section, it shall promptly notify Licensor of such decision.

(d)    Nothing in this Agreement shall be construed to prevent Licensor and Licensee from taking action jointly in any infringement suit or other action with respect to the Licensed Marks.

(e)    The party that takes action against an unauthorized third party use (unless the action is taken jointly) shall receive and retain any and all funds recovered in any such action, including without limitation, the settlement thereof, after all Parties are reimbursed for all out-of-pocket costs and expenses incurred by them in connection with such action. If the action is take jointly, then the Parties will share the expenses equally and, after payment of expenses, the parties shall share equally any funds recovered in the action, including without limitation, the settlement thereof.

**9.**    **Indemnification.**  Licensee agrees to defend, indemnify and hold harmless Licensor, its affiliates, and their respective stockholders, directors, officers, employees, agents, successors and assignees and shall pay all losses, damages, settlements, fees, expenses or costs (including reasonable attorneys' fees) incurred by them based upon any claim, demand, suit, or proceeding arising from (a) Licensee's or any sublicensee's performance of obligations under this Agreement or any sublicense agreement, (b) Licensee's or any sublicensee's breach of any covenant, representation, obligation or warranty under this Agreement or any sublicense agreement, (c) Licensee's or any sublicensee's use of the Licensed Marks or (d) the sale or distribution by Licensee or any sublicensee of any product or service bearing the Licensed Marks or any mark that is confusingly similar. Licensor shall promptly notify Licensee of any such claim, demand, suit or proceeding, and Licensee, upon written request by Licensor, shall promptly defend and continue the defense of such claim, demand, suit or proceeding at Licensee's expense. Licensor agrees to provide reasonable cooperation to Licensee, at Licensee's expense, in the defense or settlement of any such claim, demand, suit or proceeding. Nothing herein shall prevent Licensor from defending, if it so desires in its own discretion, against any such claim, demand, suit or proceeding through its own counsel, notwithstanding that the defense thereof may have been undertaken by Licensee. Licensor may select its own counsel, whose fees shall be covered by the indemnification of this Section 9, and may, if it so chooses, control the prosecution, defense and settlement of all such claims and actions.

**10.**    **Disclaimer of Warranty.**  THE MARKS ARE PROVIDED "AS IS" TO LICENSEE AND ANY SUBLICENSEE. EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, LICENSOR DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, WITH REGARD TO THE MARKS AND THIS AGREEMENT, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTIES OF NON-INFRINGEMENT OR TITLE OR ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE IN TRADE.

**11.**    **Limitation of Liability.**  NEITHER PARTY SHALL BE LIABLE FOR ANY SPECIAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR INCIDENTAL DAMAGES (INCLUDING LOST PROFITS) ARISING FROM ANY CLAIM RELATING TO THIS

CPAM: 7045033.9

AGREEMENT OR RESULTING FROM THE USE OF THE MARKS, WHETHER THE CLAIM FOR SUCH RELIEF IS BASED ON WARRANTY, PROPERTY, CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), IN LAW OR IN EQUITY OR OTHERWISE, EVEN IF A REPRESENTATIVE OF SUCH PARTY IS ADVISED IN ADVANCE OF THE POSSIBILITY OR LIKELIHOOD OF SAME.

12.    **Term.**    The term of this Agreement shall begin on the Effective Date and shall continue for a period of twenty (20) years thereafter (the "Initial Term"). Thereafter, this Agreement shall automatically renew for successive periods of twenty (20) years (each, a "Renewal Period") unless either party gives written notice to the other of its intent not to renew not less than six (6) months prior to the end of the Initial Term or the affected Renewal Term. The Initial Period together with all Renewal Periods, if any, shall constitute the "Term" of this Agreement, unless the Agreement is terminated early pursuant to Section 13. Upon termination of this Agreement or expiration of the Term, Licensee shall cease all use of the Licensed Marks.

13.    **Termination and Default.**

(a)    Licensor shall have the right to terminate this Agreement immediately, by giving written notice to Licensee, in any of the following situations:

(i) Licensee materially fails to comply with applicable law in (A) its use of the Licensed Marks; or (B) any aspect of the manufacture, sale, marketing, provision, or distribution of products or services bearing the Licensed Marks or any mark that is confusingly similar; or

(ii) (A) Licensee's voluntary or involuntary insolvency, (B) Licensee's commission of an action of bankruptcy, (C) adjudication of Licensee's bankruptcy, (D) Licensee's filing of a petition for voluntary or involuntary bankruptcy or similar proceeding, (E) an agreement between Licensee and its creditors generally is entered into providing for extension or composition of debt, (F) a receiver is appointed to administer the assets of Licensee, (G) the assets of Licensee are liquidated, or (H) any distress, execution or attachment is levied on such of its manufacturing or other equipment as is used in the production and distribution of the goods or services offered using the Licensed Marks.

(b)    Without limiting Licensor's rights under Section 13(a), if either Party materially breaches any of the terms, conditions or obligations of this Agreement, and such breach remains uncured for a period of sixty (60) days after written notice thereof from the non-breaching Party, then the non-breaching Party may, at its election, declare this Agreement terminated. For purposes of this Section 13(b), a material breach shall include:

(i) Licensee uses any of the Licensed Marks in any manner that is inconsistent with the terms of this Agreement;

(ii) Licensee's material failure to comply with its obligations under Section 5;

9

*Execution Copy*

(iii)Licensee's material failure to comply with its obligation to use the Licensed Marks in a manner consistent with the Brand Identity Guidelines;

(iv)Licensee's misconduct which materially and adversely impacts the License Marks or the associated goodwill; and

(v) Licensee's use of any of the Licensed Marks for any purpose other than the Permitted Purpose.

(c)     Licensor may also terminate this Agreement by giving Licensee thirty (30) days' prior written notice in such case where there is a transfer to a bona-fide third-party purchaser, whether direct or indirect, of (i) all or substantially all of the assets used by Licensee in its conduct of its business or (ii) a controlling interest in Licensee, whether by merger or sale or otherwise.

(d)     This Section 13(d) and Sections 1, 2, 3, 7, 9, 10, 11, 12 (the last sentence thereof only), 15, 16, 17, 18, 21, 22, 23, 24, 25, 26, 28, and 30 shall survive termination of this Agreement.

**14.    Right of First Offer.**  If Licensor at any time during the Term intends to assign or otherwise transfer all of its right, title and interest in and to the Licensed Marks, together with the goodwill of the business in connection with and symbolized by the Licensed Marks, and including, without limitation, all registrations and applications for registration thereof anywhere in the world, Licensor shall first offer to assign or otherwise transfer such rights to Licensee on terms to be mutually agreed by the Parties and shall negotiate exclusively with Licensee with respect to such rights for a period of no less than ninety (90) days (the "ROFO Period"). If the Parties are unable to enter into a mutually agreeable definitive agreement within the ROFO Period, then Licensor shall be free to make offers to and negotiate with third parties for such rights.

**15.    Rights and Duties Upon Expiration and Termination.**  Upon expiration or termination of this Agreement for whatever reason, all rights granted to Licensee hereunder shall revert to Licensor.  Licensee, at Licensee's sole expense, shall immediately undertake the following in the event that this Agreement expires or is terminated:

(i) cease using the Licensed Marks or any term, phrase or design that is confusingly similar to, or a colorable imitation or translation of the Licensed Marks, or any portion of the Licensed Marks in any manner whatsoever;

(ii) recall and destroy and/or dispose of all goods in connection with which the Licensed Marks are used, as well as all related packaging and marketing collateral, which are on hand or in process as of the date that notice of termination is sent or this Agreement expires, as the case may be;

(iii)promptly destroy, or return to Licensor, as directed by Licensor, all Authorized Products containing the Licensed Marks; and

(iv)if registration of a domain name utilizing one or more of the Licensed Marks is permitted hereunder, upon the expiration or earlier termination of this

10

Agreement, Licensee shall assign such domain names to Licensor and take all steps required by the applicable domain name registrar to complete such assignment to Licensor within thirty (30) days of such expiration or termination.

**16.    Injunctive Relief.** Licensee hereby acknowledges and agrees that the obligations of Licensee set forth in this Agreement are unique and special and that the breach thereof by Licensee will cause irreparable harm to Licensor. Upon breach of this Agreement by Licensee, Licensor shall be entitled to specific performance and injunctive relief in any court of competent jurisdiction without the need to post a bond or provide an undertaking.

**17.    Confidentiality.**

(a)    Subject to Section 17(b) herein, all oral or written information relating to each Party, its pricing, products, planning, marketing strategies, ideas, know-how, customers, suppliers, sales estimates, business plans, client lists, profit margins, media lists, databases, computer code, and any other information of the business or affairs of each Party that is not publicly known, including this Agreement and its subject matter, together with any summaries, declarations, extracts, analysis, compilations, studies, or other documents or records which contain, reflect or are generated from such information (hereinafter referred to as "Confidential Information"), are valuable assets of the Party owning the same. Each Party, its employees and agents will treat all Confidential Information disclosed to it in connection with performing this Agreement as strictly confidential and shall use protections at least equal to those used by the Party to protect its own Confidential Information.

(b)    Confidential Information shall not include information that the Parties agree is not Confidential Information, or information that the recipient Party can demonstrate: (1) was known to the recipient prior to disclosure to it in the course of performing the Agreement; (2) was obtained without any confidentiality obligation by the recipient from a Person other than the other Party provided such Person lawfully obtained and disclosed the information; (3) was independently developed by or on behalf of the recipient without access to the Confidential Information of the other Party; (4) was publicly known prior to receipt by the recipient; or (5) becomes publicly known after receipt by, and without fault of, the recipient.

(c)    Each Party shall: (1) use Confidential Information only as expressly permitted herein for purposes of performing this Agreement; (2) obtain prior express written consent of the other Party before disclosing Confidential Information other than to its employees, in-house and outside legal counsel, who require the information in performing this Agreement; (3) not reproduce, or permit to be reproduced, any document in human-readable or any other form containing Confidential Information, except as necessary for performing the Agreement and permitted by this Agreement; and (4) promptly upon the end of the Term or earlier termination of this Agreement return all documents and other materials, regardless of ownership, embodying or which resulted from the use of, any Confidential Information of the other Party.

(d)    Notwithstanding the foregoing, either Party may disclose Confidential Information to the extent required by law, regulation or court order by a court or authority of

competent jurisdiction. In such event, (1) the disclosure shall extend only to information whose disclosure is so required, (2) the Party making such disclosure shall (to the extent permitted by law) promptly and before disclosure notify the other Party of the proposed disclosure, and (3) the Party making such disclosure shall use best efforts to seek from the applicable court or authority confidential treatment of the Confidential Information to be disclosed and an opportunity for the other Party to seek further limitation of the disclosure by petitioning such court or authority. No information shall be divested of its status as Confidential Information by virtue of disclosure per se pursuant to this Section 17(d).

18. **Further Assurances.** Licensee agrees to execute such other documents and take all such actions as Licensor may reasonably request to enforce the terms of this Agreement. At Licensor's reasonable request, Licensee shall cooperate with and provide reasonable assistance to Licensor (including execution and delivery of affidavits, declarations, oaths, samples, exhibits, specimens and any other documentation) in order to register and protect the Licensed Marks.

19. **Required Approvals.** Licensee shall obtain, at its sole cost and expense, all necessary licenses, permits and approvals of this Agreement required by any government or governmental agency to conduct its business. Performance of this Agreement shall be subject to Licensee's obtaining all necessary licenses, permits and approvals pursuant to this Section 19 and to the terms of any such licenses, permits and approvals.

20. **Assignment.**

(a) *Licensor Assignment.* Licensor shall have the right to assign the Licensed Marks, this Agreement, whole or in part, and any or all of its rights, obligations and privileges hereunder to any other Person.

(b) *Licensee Assignment.* Licensee hereby acknowledges and agrees that this Agreement and the licenses granted herein are personal to Licensee and the Persons who direct Licensee's affairs and are granted in reliance of such Persons' skills and attributes. This Agreement and its related rights and obligations, including any license granted herein, may not be sold, assigned, delegated, sublicensed or otherwise transferred or encumbered, in whole or in part, without the prior written consent of Licensor, which consent may not be unreasonably withheld or delayed. Any such purposed assignment, pledge or transfer by Licensee without such prior written consent from Licensor shall be void *ab initio*. For purposes of this Agreement, the voluntary sale or transfer of any Licensee stock, Licensee assets or ownership interest in or control of Licensee, or a change of control of any entity that is a shareholder of Licensee, shall be deemed an assignment hereunder. Any permitted assignee hereunder shall agree in a writing reasonably satisfactory to Licensor to be bound by the terms and conditions of this Agreement, and a copy of such writing shall be promptly delivered to Licensor. No assignment by Licensee shall relieve Licensee of its obligations or any liability hereunder.

21. **Language.** All correspondence, notices, reports, and any other communications between the Parties shall be in English, which shall be the language of this Agreement. Any disputes arising hereunder, if legal action is taken, shall be prosecuted and adjudicated in English.

22.    **Notices.**    Any notice, request, demand, or other communication required or permitted under this Agreement shall be made in writing and shall be deemed given either (a) ten (10) business days after depositing the notice in the postal service, addressed to the Party as set forth below, with proof of mailing; (b) two (2) business days after posting if delivered by internationally recognized courier, with proof of delivery, addressed to the Party as set forth below or (c) on the next business day after such notice has been sent by facsimile or email.    Each Party agrees to provide prompt written notification to the other Party of any change of such Party's address.    All notices to a Party will be sent to the addresses set forth below or to such other address or Person as such Party may designate by notice to the other Party hereunder:

<div style="margin-left:2em">

If to Licensor to:            Jake Wood
300 North Continental Boulevard
Suite 150
El Segundo, CA  90245
wood@teamrubiconusa.org


If to Licensee to:            William McNulty
300 North Continental Boulevard
Suite 150
El Segundo, CA  90245
mcnulty@teamrubiconglobal.org

</div>

23.    **No Waiver.**    Waiver of or failure by a Party to complain of any act, omission or default on the part of the other Party, no matter how long the same may continue or how many times such shall occur, shall not be deemed a waiver of rights, or of any similar future act, omission or default under this Agreement.

24.    **Disputes; Governing Law; Jurisdiction.**    The interpretation and construction of this agreement, and all matters relating hereto, shall be governed by the laws of the State of New York without regard to the choice of law principles applicable in such state. Each Party hereby irrevocably acknowledges and consents that any legal action or proceeding brought with respect to any of the obligations arising under or relating to this Agreement shall be brought in the state or federal courts of the State of New York, located in the County of New York and each of the Parties hereby irrevocably submits to and accepts with regard to any such action or proceeding, for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts.  Each Party hereby further irrevocably waives any claim that any such courts lack jurisdiction over such Party or objection based on *forum non conveniens* or improper venue, and agrees not to plead or claim, in any legal action or proceeding with respect to this Agreement or the transactions contemplated hereby brought in any of the aforesaid courts, that any such court lacks jurisdiction over such Party.

25.    **Interpretation.**    In resolving any dispute or construing any provision in this Agreement, there shall be no presumption made or inference drawn (a) because the attorneys for one of the Parties drafted the Agreement; (b) because of the drafting history of the Agreement; or (c) because of the inclusion of a provision not contained in a prior draft or the deletion of a provision contained in a prior draft.

**26.** <u>Invalidity; Severability</u>. If any term, covenant, condition or provision of this Agreement or the application thereof to any Person or circumstance, shall to any extent be held invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to any Person or circumstance, other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each other term, covenant, condition or provision of this Agreement shall be valid and shall be enforced to the fullest extent provided by law.

**27.** <u>Force Majeure</u>. Neither Party will incur any liability to the other Party on account of any failure to perform, loss or damage resulting from any delay or failure to perform all or any part of this Agreement if such delay or failure is caused, in whole or in part, by events, occurrences, or causes beyond the reasonable control, and without gross negligence, of the Parties. Such events, occurrences, or causes shall include acts of God, riots, acts of war, acts of terrorism, earthquake, fire and explosions; provided that, the inability to meet financial obligations is expressly excluded from the excusal from performance pursuant to this Section.

**28.** <u>Section Headings</u>. The section headings in this Agreement have been inserted merely for convenience, are not a part of this Agreement, and shall not affect the rights and obligations of the Parties or the meaning of the language in this Agreement.

**29.** <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one Party, but all of which, taken together, shall constitute one and the same agreement.

**30.** <u>Entire Agreement; Amendments</u>. This Agreement sets forth the entire understanding between the Parties relating to the subject matter contained herein, and all prior discussions and writings between the Parties with respect thereto are superseded by this Agreement. The Parties may consider and discuss amendments to this Agreement as they deem appropriate, however, no modifications, amendments, or additions to this Agreement shall be effective or binding unless set forth in a writing signed by both Parties.

**[Remainder of this page intentionally left blank; signature page follows]**

14

*Execution Copy*

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement, effective as of the Effective Date.

Licensor                                Licensee

TEAM RUBICON, INC.                      TEAM RUBICON GLOBAL, LTD.

By: _____          By: _____

Name: __JACOB WOOD_____           Name: __Charles F. Kalmbach___

Title: __President and CEO___           Title: __Chairman of Board___

15

*Execution Copy*

## SCHEDULE A

### LICENSED MARKS

### REGISTERED MARKS

| MARK | COUNTRY | CLASS | APP'N NO. | REG'N NO. | REG'N DATE |
|------|---------|-------|-----------|-----------|------------|
| TEAM RUBICON | Australia | 35, 44, 45 | 1551282 | 1551282 | April 7, 2014 |
| TEAM RUBICON | Canada | 35, 44, 45 | 1622427 | | |
| TEAM RUBICON | European Community (CTM) | 35, 44, 45 | 011728417 | 011728417 | October 11, 2013 |
| TEAM RUBICON | Norway | 35, 44, 45 | 201304549 | 272771 | October 23, 2013 |

### COMMON LAW MARKS

TEAM RUBICON





16

*Execution Copy*

## SCHEDULE B

## FORM OF SUBLICENSE AGREEMENT

*[See attached]*

*Execution Copy*

## SCHEDULE C

## LIST OF PRE-DETERMINED TRCU TARGET NATIONS

UK

Norway

Germany

France

Poland

Turkey

Australia

New Zealand

Canada

Netherlands

Italy

Philippines

18

*Execution Copy*

## SCHEDULE D

## LIST OF PRE-DETERMINED TRRU TARGET NATIONS

[TBD]

*Execution Copy*

## SCHEDULE E

## 6 POINTS TERMS AND CONDITIONS

*[See attached]*



## Point 1 (Readiness and Capability)

*How will we ensure each TRx is ready and capable to do international deployments so they do not put the brand and other TRs at risk?*

In order to satisfy this, the Country Council, made up of WM, JW, and the other TR CEOs will assess and validate TRx readiness according to a predetermined matrix or scorecard. Once they are ready/validated, they can plan, propose and execute response operations. This process needs to be developed with input from TR USA, working together with TRG staff (once established). In the interim, a TRx will not conduct an international deployment without a TR-approved incident commander.

## Point 2 (Approval of Reactive International Ops)

*How will approval for reactive international operations be obtained?*

TRG will call for a vote by simple majority. Each TRx has 6 hours to cast their vote for response operations, and 24 hours for proactive missions. Only votes received within the required time period will be counted. An adverse vote would be largely determined on potential risks to the brand or in consideration of a safety risk. TRG will develop criteria/guidelines for voting.

## Point 3 (OPCON on International Missions)

*How will OPCON (or lead) of international missions be established?*

TR USA will retain OPCON (or lead) on international missions until a TRx is ready and validated. After a TRx is validated, the Country Council can determine which TRx has lead for each disaster.

## Point 4 (Annual Audit Process)
*What role will Country Councils play in the TRG Annual Audit Process?*

Country Council representatives will be part of the TRG Annual Audit process - incorporating a "peer review" component - as part of the recertification of the TRx going forward.

## Point 5 (Functional Area Working Groups)
*How will a new TRx be supported during its inception?*

The role of TRG in this process is one of facilitator, aggregator, and monitor. The leaders of the TRx are required to drive best processes, standards, and innovation. TRG and TR USA are aligned on the idea of



working groups being established. At this point, TR USA is the only TRx capable of leading these groups. For the first year, TR USA will chair each working group. Each year, a new chair for each working group will be elected/re-elected by the prior year's working group. Every TRx should be represented in each working group. Initial working groups will include: field operations, technology, and communications.

**Point 6 (Fundraising and Marketing)**

- TRG founding sponsors will be recognized as Strategic Sponsors on the TR USA website, either on the Strategic Sponsor Page or a separate page titled Team Rubicon Global Strategic Sponsors.
- A press release announcing the sponsor will be issued and reside on the TRx website. TRG will work with the TRx to occasionally promote the TRG founding sponsor via social platforms, at the discretion of the TRx Director of Communications.
- TRG sponsors will be eligible to have their employees participate in response operations at the sole discretion of the IC on the ground. Will be at the level dictated by the tbd guidelines of the Ready Reserve. Social media mentions will be made in accordance with SM standards when sponsors participate in response operations.
- TRG sponsors will be eligible to have their employees participate in response operations at the sole discretion of the IC on the ground. Will be at the level dictated by the tbd guidelines of the Ready Reserve. Social media mentions will be made in accordance with SM standards when sponsors participate in response operations.
- Any disaster related philanthropy will be passed to the TRx as directed by the sponsor. This may mean it's given to TRG to be distributed to the TRxs, but it will be distributed to the TRxs. If given to TRG it will be distributed at the discretion of the funder or pro rata.



July 29, 2015

Adam Miller
Chairman
TR-USA

Dear Adam,

In 2013, the Board of TR-USA received the report of its International Expansion Committee, which had been asked to develop an approach to addressing the growing demand for local TR organizations on the part of veterans of non-US coalition countries. The report set forth the mission and vision of how TR could respond and, as a result of its deliberations, the Board set this project as one of its strategic objectives. In early 2014, the Board contracted with the innovation firm IDEO to develop the design of an international Team Rubicon organization that would bring this vision to reality.

In August, 2014, the Board received and accepted the IDEO organization plan, which calls for a network of TRx and TRready country organizations with an essential, facilitating hub called TRG (Team Rubicon Global). By later action of the Board, the launch date for TRG was set for April 1, 2015. TRG was organized as a legal entity and 501-(c)-3 status was obtained in May 2015.

In light of the on-going recognition of the IDEO design as the road map for the operation of the TR network, TRG will reimburse TR-USA for IDEO fees invoiced and paid for the 2014 engagement (believed to be $400,000). (Copies of the IDEO invoices will be required by TRG for its tax filings.) Payment will be made in six quarterly installments, commencing when the level of $1.5million of (TRG) annual revenue is reached. However, when $2 million of annual revenue is reached, payment will be completed in two quarterly installments, or immediately if two payments have already been made. As is customary, when payment is completed, TRG will own all rights, title and interest in the IDEO work product subject to TR-USA having a non-exclusive right to use the IDEO work product for as long as the Team Rubicon Master Trademark License Agreement is in effect.

Sincerely,

Charles F. Kalmbach
Chairman

teamrubiconglobal.org                    300 N. Continental Blvd. Suite 100 • El Segundo, CA 90245
                                          phone +1 (310) 640-8787